UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/8/15

UNITED SPECIALTY INSURANCE
COMPANY,

                    Plaintiff,

- against -

BARRY INN REALTY INC.,

                    Defendant.

**MEMORANDUM
OPINION & ORDER**

14 Civ. 4892 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

       Plaintiff United Specialty Insurance Company (the "Insurer") issued an insurance policy to Defendant Barry Inn Realty, Inc. ("Barry") providing coverage for premises located at 1129 Longwood Avenue, Bronx, New York (the "Premises"). The Insurer filed this action on June 30, 2014, after Barry submitted a claim under the policy for damage sustained by the Premises from a marijuana-growing operation conducted by Barry's tenant. The Insurer seeks a declaration that it has no obligation to indemnify Barry for damage to the Premises caused by Barry's tenant's dishonest or criminal acts. (Cmplt. (Dkt. No. 1)) Barry has filed a breach of contract counterclaim against the Insurer. (Answer and Counterclaim (Dkt. No. 11))

       The parties have filed cross-motions for summary judgment. (Pltf. Motion (Dkt. No. 36); Def. Motion (Dkt. No. 44)) For the reasons stated below, Plaintiff's motion will be granted, and Defendant's motion will be denied.

## BACKGROUND[1]

Barry acquired the Premises in 2004 or 2005. (Pltf. R. 56.1 Stmt. (Dkt. No. 39) ¶ 4) On or about December 31, 2012, Barry and Luis Zepeda Castelliano entered into a five-year lease for the Premises. (Def. R. 56.1 Stmt. (Dkt. No. 48) ¶ 2) The lease began on January 1, 2013, and was to end on December 31, 2017. (Id. ¶ 3) Under the terms of the lease, "Tenant [Castelliano] [was to] use and occupy [the] . . . premises for [a] bar/restaurant with license only/no strip club and for no other purpose." (Pltf. R. 56.1 Stmt. (Dkt. No. 39) ¶ 9; see Kohane Aff. (Dkt. No. 37) Ex. G (Lease) at 2) According to Shlomo Denti, the sole owner of Barry, Castelliano stated that he wanted to make changes to the floor, kitchen, and gas line in order to establish a sports bar and restaurant at the Premises. (Pltf. R. 56.1 Stmt. (Dkt. No. 39) ¶ 11; see Kohane Aff. (Dkt. No. 37) Ex. E (Denti Dep.) at 43) Accordingly, the lease provides that rent for "February [2013] will be [zero dollars,] as compensation to the tenant to make the desired repairs at the location." (Pltf. R. 56.1 Stmt. (Dkt. No. 39) ¶ 10; see Kohane Aff. (Dkt. No. 37) Ex. G (Lease) at 7)

On August 8, 2013, a New York City Police Department ("NYPD") Drug and Alcohol Unit detective contacted Denti to inform him that the police were planning to execute a search warrant at the Premises because they believed that the Premises were being used for drug trafficking. (Def. R. 56.1 Stmt. (Dkt. No. 48) ¶¶ 8, 11-13) Upon entry, the police discovered that the Premises were being used grow marijuana. (Id. ¶ 9)

---

[1] The following facts are undisputed except where otherwise noted, and are drawn from the parties' Local Rule 56.1 Statements and other evidence in the record. See Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001) ("while a court 'is not required to consider' [matters not addressed in the parties'] Local Rule 56.1 statements, it may in its discretion opt to 'conduct an assiduous review of the record.'" (quoting Monahan v. New York City Dep't of Corrections, 214 F.3d 275, 292 (2d Cir. 2000)).

2

In constructing a marijuana-growing operation at the Premises, Castelliano removed or modified a number of building components, and installed a sprinkler system and illegal wiring. (Pltf. R. 56.1 Stmt. (Dkt. No. 39) ¶¶ 28-30; see Kohane Aff. (Dkt. No. 37) Ex. I (Report) at 17-18) The extreme humidity necessary to grow marijuana caused significant damage throughout the building and required the demolition and replacement of most of the interior building components. (Id.) Denti was not aware of these modifications at the Premises and was "completely shocked" by the drug operation uncovered by the police. (Def. R. 56.1 Stmt. (Dkt. No. 48) ¶ 14; see Kohane Aff. (Dkt. No. 37) Ex. E (Denti Dep.) at 55-57)

Before Barry entered into the lease with Castelliano, Denti had obtained a credit report concerning Castelliano. The credit report did not reveal anything unusual and did not disclose that Castelliano had been or was involved in drug trafficking. (Def. R. 56.1 Stmt. (Dkt. No. 48) ¶¶ 15-16; see Azus Aff. (Dkt. No. 45) Ex. F (Credit Report)) Moreover, Castelliano took Denti to a restaurant and a bar in Yonkers, New York, which he claimed were successful businesses that he and his associates were operating. (Def. R. 56.1 Stmt. (Dkt. No. 48) ¶ 17)

Castelliano always made the rent payments on time, and made those payments in person at Denti's office at 1118 Longwood Avenue, Bronx, New York. (Id. ¶¶ 5-6) Indeed, all of the interactions between Denti and Castelliano took place at Denti's office and not at the Premises. (Id. ¶ 26) Although – as of August 2013 – the planned sports bar and restaurant had still not opened, Denti was not concerned. (Id. ¶¶ 19, 22) Castelliano repeatedly told Denti that repairs at the Premises were underway, and that he was waiting for the issuance of a liquor license. Denti believed that it usually took six to eight months to obtain a liquor license. (Id. ¶¶ 19-22; see Kohane Aff. (Dkt. No. 37) Ex. E (Denti Dep.) at 47) Accordingly, Denti never exercised Barry's right under the lease "to access the property without notice for inspection of

3

the property." (Pltf. R. 56.1 Stmt. (Dkt. No. 39) ¶¶ 13-14; see Kohane Aff. (Dkt. No. 37), Ex. G (Lease) at 7) As a result, Denti was not aware that Castelliano was growing marijuana at the Premises, nor was he aware that Castelliano was engaging in other conduct that violated the lease. (Def. R. 56.1 Stmt. (Dkt. No. 48) ¶¶ 14, 25; see Kohane Aff. (Dkt. No. 37) Ex. E (Denti Dep.) at 55-57)

On August 5, 2013 – three days before the NYPD raid – the Insurer issued a Commercial Lines Policy (the "Policy") to Barry. (Pltf. R. 56.1 Stmt. (Dkt. No. 39) ¶ 32; see Kohane Aff. (Dkt. No. 37) Ex. J (Policy)) The Policy states, in relevant part, that the Insurer "will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." (Kohane Aff. (Dkt. No. 37) Ex. J (Policy) at 54) The Policy also contains the following exclusion: "[Plaintiff] will not pay for loss or damage caused directly or indirectly by . . . . [d]ishonest or criminal acts by . . . anyone to whom [Defendant] entrust[s] the property for any purpose . . . ." (Id. at 75, 77)

On August 9, 2013, Barry submitted a notice of claim to the Insurer for the damage Castelliano had caused to the Premises. (Pltf. R. 56.1 Stmt. (Dkt. No. 39) ¶ 27; see Kohane Aff. (Dkt. No. 37) Ex. D (Property Loss Notice)) On September 7, 2013, Cunningham Lindsey – an investigator retained by the Insurer – conducted an inspection of the Premises and reported the following:

> [B]uilding components were removed from the structure for the atmosphere needed for the marijuana plants. All building components were disturbed throughout the main floor and 2nd floor of the building to allow for the installation of a sprinkler system, duct system, illegal electricity and other components throughout the building.
>
> . . . .

> Due to the extreme humidity conditions needed to run the operation, damage was also sustained throughout the building structural components, requiring [a] majority of the interior components to be demolished and replaced.

(Kohane Aff. (Dkt. No. 37) Ex. I (Report) at 17-18)  This damage was caused by or resulted from the acts of Castelliano related to the marijuana growing operation.  See id.; Pltf. R. 56.1 Stmt. (Dkt. No. 39) ¶ 31.

On or about January 28, 2014, Barry received a letter from the Insurer requesting that Barry complete and file a Proof of Loss form.  (Def. R. 56.1 Stmt. (Dkt. No. 48) ¶ 32; see Azus Aff. (Dkt. No. 45) Ex. I (Jan. 28, 2014 Ltr.))  On March 20, 2014, Barry sent a Sworn Statement and Proof of Loss, with supporting documentation, to the Insurer.  (Def. R. 56.1 Stmt. (Dkt. No. 48) ¶ 33; see Azus Aff. (Dkt. No. 45) Ex. J (Mar. 20, 2014 Sworn Statement and Proof of Loss))

Rather than pay Barry's claim, on June 30, 2014, the Insurer filed this action.  (Cmplt. (Dkt. No. 1))  The Insurer seeks a declaration that it has no obligation to indemnify Barry for damage to the Premises caused by Castelliano.  The Insurer contends that the Policy exclusion barring coverage for damage caused by the dishonest or criminal acts of someone to whom Barry entrusted the Premises is applicable.  (Id.)  On September 5, 2014, Barry filed an Answer containing a counterclaim alleging breach of contract.  (Answer and Counterclaim (Dkt. No. 11))  Pending before this Court are the parties' cross-motions for summary judgment.  (Pltf. Motion (Dkt. No. 36); Def. Motion (Dkt. No. 44))

## DISCUSSION

### I. LEGAL STANDARDS

#### A. Summary Judgment Standard

Summary judgment is warranted when a moving party shows that "there is no genuine dispute as to any material fact" and that that party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)). "'[W]here the non[-]moving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the non[-]moving party's claim.'" Lesavoy v. Lane, No. 02 Civ. 10162 (RWS), 2008 WL 2704393, at *7 (S.D.N.Y. July 10, 2008) (quoting Bay v. Times Mirror Magazines, Inc., 936 F.2d 112, 116 (2d Cir. 1991)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)). However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

B.     **Legal Standard for Interpretation of an Insurance Policy**

"Under New York law, the initial interpretation of a contract 'is a matter of law for the court to decide.'" K. Bell & Assocs. v. Lloyd's Underwriters, 97 F.3d 632, 637 (2d Cir. 1996) (quoting Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 299 (2d Cir. 1996)); see also Terwilliger v. Terwilliger, 206 F.3d 240, 245 (2d Cir. 2000) ("Construing an unambiguous contract provision is a function of the court, rather than a jury, and matters extrinsic to the agreement may not be considered when the intent of the parties can fairly be gleaned from the face of the instrument.") (citing Teitelbaum Holdings, Ltd. v. Gold, 48 N.Y.2d 51, 56 (1979)). New York law also provides that "'the interpretation of an insurance policy generally presents a question of law.' The Court must give plain and unambiguous provisions their ordinary meaning and construe the policy liberally in favor of the insured." Haque v. Commerce and Industry Ins. Co., No. 11 Civ. 9360 (LTS), 2013 WL 4083270, at *1 (S.D.N.Y. Aug. 13, 2013) (quoting Allianz Ins. Co. v. Lerner, 416 F.3d 109, 115-16 (2d Cir. 2005)) (internal citation omitted). "Where there are alternative, reasonable constructions of a contract, i.e., the contract is ambiguous, the issue 'should be submitted to the trier of fact.'" K. Bell & Assocs., 97 F.3d at 637 (quoting Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 573 (2d Cir. 1993)).

Under New York law, "[o]nce [the insured] [establishes] that it sustained a loss to covered property, the burden shifts to the insurance company to prove that the claimed loss is subject to an exclusion." Warehouse Wines & Spirits, Inc. v. Travelers Property Cas. Co. of Am., No. 13 Civ. 5712 (KBF), 2015 WL 1454883, at *5 (S.D.N.Y. Mar. 31, 2015). "Courts in New York have held that exclusions for the dishonest acts of persons to whom the insured entrusts its property are enforceable." Id. (collecting cases). Generally, such exclusionary

clauses are "given the interpretation most beneficial to the insured." M.H. Lipiner & Son, Inc. v. Hanover Ins. Co., 869 F.2d 685, 687 (2d Cir. 1989).

## II. ANALYSIS

The Insurer argues that it is not obligated to indemnify Barry based on, inter alia, the entrustment exclusion in the Policy, which precludes coverage for "damage caused directly or indirectly by . . . . [d]ishonest or criminal act[s] by . . . anyone to whom [Defendant] entrust[ed] the property . . . ." (Kohane Aff. (Dkt. No. 37) Ex. J (Insurance Policy) at 75, 77) The parties agree, for purposes of their summary judgment motions, that the damage to the Premises was caused by the acts of tenant Castelliano. (Pltf. R. 56.1 Stmt. (Dkt. No. 39) ¶ 31; Def. R. 56.1 Stmt. (Dkt. No. 48) ¶ 10) There is likewise no dispute that Castelliano committed dishonest and criminal acts within the meaning of the Policy. See Pltf. R. 56.1 Stmt. (Dkt. No. 39) ¶¶ 29-30; Def. R. 56.1 Stmt. (Dkt. No. 48) ¶¶ 8-9) Accordingly, the cross-motions for summary judgment turn on whether Barry "entrusted" the Premises to Castelliano.

### A. Entrustment Under New York Law

"The term 'entrust' must be 'given its ordinary meaning, such as the average policyholder of ordinary intelligence, as well as the insurer, would attach to it,' and cannot be 'deemed to have been used as [a] word[] of art with legalistic implications.'" Cougar Sport v. Hartford Ins. Co. of Midwest, 190 Misc. 2d 91, 94 (N.Y. Sup. Ct. 2000) (quoting Abrams v. Great Am. Ins. Co., 269 N.Y. 90, 92 (1935) (alterations in Cougar Sport)), aff'd, 288 A.D.2d 85 (1st Dep't 2001). Applying this standard, it is well established under New York law that the term "entrust" means that the insured "surrender[ed] or deliver[ed] or transfer[red] . . . possession [of premises] with confidence that the property would be used for the purpose intended by the owner and as stated by the recipient." Abrams, 269 N.Y. at 92.

In determining whether an insured has entrusted property to another, "[t]he controlling element is the design of the owner rather than the motive of the one who obtained possession." Id. Accordingly, even where an insured "[is] deceived and his confidence [is] abused, he [nonetheless may be found to have] entrusted his property to [another]." Id. (emphasis in original); see AXA Art Ins. Corp. v. Renaissance Art Invs., LLC, 32 Misc. 3d 1223(A), at *4 (N.Y. Sup. Ct. 2011) ("[T]he art works were entrusted to the Gallery, even though [the insured] was deceived by the Gallery and Salander as to their intentions."), aff'd, 102 A.D.3d 604 (1st Dep't 2013).

An entrustment exclusion in an insurance policy applies "to persons whose status is created or accepted by the assured [as] the result of a consensual relationship between the parties . . . ." Camera Mart v. Lumbermens Mut. Cas. Co., 58 Misc. 2d 448, 452 (Civ. Ct. 1968), aff'd, 64 Misc. 2d 860 (App. Term 1969) (per curiam). New York courts have found such a relationship to exist – despite a recipient's fraudulent intent – where the parties have had a course of dealing or the insured had reason to trust the recipient independent of the recipient's own representations. See Cougar Sport, 190 Misc. 2d at 95 (holding that owner had entrusted property to recipient where the parties had "contractual arrangements and [an] uneventful course of dealing [over two years]"); see also Abrams, 269 N.Y. at 92 (finding entrustment where the recipient had "previously established her credit with plaintiff").

An entrustment exclusion does not apply, however, where a property recipient's "status is solely self-generated." Camera Mart, 58 Misc. 2d at 452. Accordingly, an insured has not "entrusted" property to a recipient where there is "deceit from the outset, not only as to intent, but as to identification of the recipient." See id. at 450-52 (no entrustment where the recipient misrepresented his identity, had no prior business dealings with the owner, and was

9

unknown to the owner); see also Freedman v. Queen Ins. Co. of Am., 56 Cal. 2d 454, 457-58 (1961) (no entrustment where the recipient obtained the property "through false personation" and "by means of . . . fraudulent representations").

### B.  Barry Entrusted the Premises to Castelliano

Here, entrustment is manifest in the course of dealings between Barry and Castelliano. Negotiation of the lease took place over a three-month period. (Kohane Aff. (Dkt. No. 37) Ex. E (Denti Dep.) at 28) Denti questioned Castelliano about his experience in operating a bar and restaurant, was shown a bar and a restaurant that Castelliano was allegedly operating in Yonkers, and met with an individual who claimed to be working on obtaining a liquor license for the planned sports bar. (Id. at 27-29) After extensive negotiations, the parties entered into a five-year lease for the Premises. The lease is fourteen pages in length and contains various negotiated terms and conditions. (Azus Aff. (Dkt. No. 45) Ex. A (Lease)) Denti's interaction with Castelliano, the three-month negotiation process, and the lease itself suggest a measured and deliberate decision by Barry to permit Castelliano to occupy the Premises. See Atlantic Balloon & Novelty Corp. v. Am. Motorists Ins. Co., 62 A.D.3d 920, 923 (2d Dep't 2009) ("The contract between the [recipient] and [the insured] established that [the insured] 'entrusted' its merchandise to the [recipient] . . . ."), abrogated on other grounds by Bonded Waterproofing Services, Inc. v. Anderson-Bernard Agency, Inc., 86 A.D.3d 527, 530 (2d Dep't 2011).

Moreover, Barry did not simply rely on Castelliano's representations as to his identity and background. Denti obtained a credit report on Castelliano that confirmed his identity and revealed nothing unusual in Castelliano's past. (Def. R. 56.1 Stat. (Dkt. No. 48) ¶¶ 15-16; see Azus Aff. (Dkt. No. 45) Ex. F (Credit Report)) Before entering into the lease, Barry also obtained a copy of Castelliano's driver's license and Social Security card, which matched

10

the information Castelliano had provided.[2] See Azus Aff. (Dkt. No. 45) Ex. A (Lease) at 14; Id. Ex. F (Credit Report). In sum, Denti's actions demonstrate that he acted with care and deliberation in agreeing to accept Castelliano as a tenant and in entering into the lease.

In arguing that Barry did not entrust the Premises to Castelliano, Barry cites a number of cases in which a recipient of property lied about his or her identity and no entrustment was found. See Def. Br. (Dkt. No. 47) at 9. In each of those cases, however, the recipient's identity was "solely self-generated," and the insured never investigated the recipient's identity.[3] Here, there is no admissible evidence suggesting that Castelliano lied about his identity, and Castelliano's identity was not "solely self-generated." To the contrary, Denti investigated and confirmed Castelliano's identity, demonstrating that his status was "accepted by [Denti]" and

---

[2] Barry notes that Denti testified at his deposition that a detective investigating the marijuana-growing operation told him that Castelliano had given Denti a false identity. See Def. R. 56.1 Stmt. (Dkt. No. 48) ¶ 24) Denti's testimony about what a detective told him is hearsay, however. Barry is offering the detective's alleged statement for its truth. See Fed. R. Evid. 801(c). Because the testimony cited by Barry is inadmissible, it cannot be used to defeat the Insurer's summary judgment motion. See Fed. R. Civ. P. 56(c)(2).

[3] In Camera Mart, the court found no entrustment because the recipient fraudulently represented his identity: "plaintiff's employee received a telephone call from someone [falsely] representing [himself] to be a representative of Candid Camera, and . . . enumerated items of . . . equipment which were to be furnished to a messenger." 58 Misc. 2d at 449. Similarly, in Freedman v. Queen Ins. Co. of Am., the plaintiff "received a telephone call from a person [falsely] representing himself to be . . . an employee of a retail jeweler, advising plaintiff that there was . . . a customer who desired a three-carat diamond . . . ." 56 Cal. 2d at 456. The court found that the plaintiff did not entrust the property because the recipient committed a theft "through false personation." Id. at 457. Sec. Ins. Co. of Hartford v. Investors Diversified Ltd., Inc. likewise involved fraudulent personation by the recipient: the insured "received a telephone call, supposedly from a desirable customer who asked to be allowed to try out a fork lift . . . ." 407 So.2d 314, 315 (Fla. Dist. Ct. App. 1981). The Florida court found that there was no entrustment because "it was never [the insured's] state of mind to entrust the property to . . . an imposter." Id. at 316.

Here, by contrast, there is unrebutted evidence that Castelliano accurately represented his identity, and that Denti confirmed Castelliano's identity through a credit check and a review of Castelliano's driver's license and Social Security card.

that their contract was "the result of a consensual relationship between the parties." Camera Mart, 58 Misc. 2d at 452.

Even after the parties entered into the lease, the interactions between Barry and Castelliano were uneventful: Castelliano always paid the rent on time over the succeeding eight months, delivering the payment to Denti at Barry's offices. Castelliano also regularly updated Denti about the status of the repairs and the liquor license. (Def. R. 56.1 Stmt. (Dkt. No. 48) ¶¶ 5-6, 19-21; see Cougar Sport, 190 Misc. 2d at 95 (holding that owner entrusted property to recipient where the parties had "contractual arrangements and [an] uneventful course of dealing [for two years]")) Barry's entrustment of the Premises to Castelliano is further demonstrated by the undisputed fact that – for more than eight months – Denti never visited the Premises and chose not to exercise Barry's right to inspect the Premises. (Pltf. R. 56.1 Stmt. (Dkt. No. 39) ¶¶ 13-14; see Cougar Sport, 190 Misc. 2d at 95)

This course of dealing establishes that Barry and Castelliano had a "consensual relationship" and that Castelliano's status was "accepted by [Barry]." Camera Mart, 58 Misc. 2d at 452. Because Barry had a "consensual relationship" with Castelliano and accepted his status and identity, it is immaterial that Castelliano abused Barry's confidence and had an undisclosed intent to use the Premises to grow marijuana. See Renaissance Art Invs., 102 A.D.3d at 605 (rejecting the insured's "assertions that the exclusion clause did not apply . . . simply because [one of the recipients] turned out to be a thief"); see also Cougar Sport, 190 Misc. 2d at 95 (holding that the recipient's "subsequent improper [act] is not relevant to whether plaintiff entrusted its goods to [the recipient]"). As noted above, it is the intent of the insured that controls, see Abrams, 269 N.Y. at 92, and it is clear from the record that Barry intended to surrender, deliver, or transfer possession of the Premises to Castelliano, and that it did so with

confidence that it would be used for the purpose intended by Barry and as stated by Castelliano. Accordingly, it is clear that Barry entrusted the Premises to Castelliano, and no reasonable jury could conclude otherwise.

The Policy precludes coverage for "damage caused directly or indirectly by . . . . [d]ishonest or criminal act[s] by . . . anyone to whom [Defendant] entrust[ed] the property . . . ." (Kohane Aff. (Dkt. No. 37) Ex. J (Insurance Policy) at 75, 77)  The parties agree that the damage to the Premises was caused by the acts of Barry's tenant, and that these acts were criminal and dishonest in nature. (Pltf. R. 56.1 Stmt. (Dkt. No. 39) ¶¶ 29-31; Def. R. 56.1 Stmt. (Dkt. No. 48) ¶¶ 8-10)  Accordingly, the Policy does not provide coverage for the damage sustained as a result of Castelliano's marijuana-growing operation.[4]

## CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment is granted, and Defendant's motion for summary judgment is denied. The Clerk of the Court is directed to terminate the motions (Dkt. Nos. 36, 44) and to close this case.

Dated: New York, New York
       September 8, 2015

SO ORDERED.

_Paul G. Gardephe_
Paul G. Gardephe
United States District Judge

---

[4] The Insurer also argues that the Policy "precludes damages which are caused by or resulting from the presence or condensation of humidity, moisture or vapor that occurs over a period of 14 days." (Pltf. Br. (Dkt. No. 38) at 12)  Because the Court finds that the Policy exclusion for "dishonest or criminal acts" applies, the Court does not reach this argument.

13